IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MICHAEL A. DICICCO, STACEY A | : | CIVIL ACTION |
| DICICCO, JOSEPH S. MAGUIRE and | : | |
| RITA M. MAGUIRE, individually and on | : | |
| behalf of all others similarly aggrieved | : | |
| | : | |
| v. | : | |
| | : | |
| CITIZENS FINANCIAL GROUP, INC., et al. | : | NO. 15-267 |

<u>MEMORANDUM</u>

**Padova, J.**                                                **September 10, 2015**

Plaintiffs filed this putative class action against Citizens Financial Group, Inc. and Citizens Bank of Pennsylvania, Inc. (collectively, "Citizens"), alleging that Citizens overbilled borrowers on Home Equity Lines of Credit ("HELOC") loan agreements by requiring higher monthly payments during the first part of the loan repayment period than the loan contracts permitted.   The Second Amended Complaint (the "Complaint") asserts claims for breach of contract, violation of the Truth in Lending Act (the "TILA"), 15 U.S.C. § 1601 *et seq.*, and violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), 73 Pa. Stat. Ann. § 201-1 *et seq.*   Citizens has moved to dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted.   We held argument on the Motion on July 29, 2015.   For the following reasons, we grant the Motion in part, and deny it in part.

## I.      BACKGROUND

The Complaint alleges that Citizens provides consumers with HELOC loans that are secured by residential real estate.   (Second Am. Compl. ("Compl.") ¶¶ 9, 11.)   Named Plaintiffs Michael and Stacey DiCicco, and Joseph and Rita Maguire, all entered into HELOC loan agreements with Citizens.   (<u>Id.</u> ¶ 9.)   Each HELOC loan agreement (the "Agreement") begins

with a "Draw Period" during which time borrowers may "draw up to the maximum loan amount and pay interest only on the outstanding principal balance."   (<u>Id.</u> ¶ 10.)   When the Draw Period concludes, the "Repayment Period" begins, during which borrowers may no longer borrow, and the outstanding balance on the loan is converted to a fifteen-year term loan.   (<u>Id.</u>)   During the Repayment Period, borrowers are required to make "Minimum Payments" each month.   (<u>Id.</u> ¶ 18.)

The DiCiccos' Agreement, which is attached as Exhibit C to the Complaint,[1] contains the following provision that describes the calculation of Minimum Payments during the Repayment Period:

> During the Repayment Period, your regular payment will be based on an amortization of your balance over a 180 month period or $20.00, whichever is greater.   Your payments will be due monthly.   In calculating the payment amount by amortizing the balance over a 180 month period, we will use the applicable variable Annual Percentage Rate [("APR")] in effect on the day we calculate your payment.   Your "Minimum Payment" will be the regular payment, plus any amount past due and all other charges. . . .

> A change in the [APR] can cause the balance to be repaid more quickly or more slowly.   When rates decrease, less interest is due, so more of the payment repays the principal balance.

(Compl. Ex. C § 3.c.)   In addition, the TILA required Citizens to make separate disclosures to borrowers regarding how their Minimum Payments were to be determined during the Repayment Period, but the Complaint alleges that Plaintiffs received no such disclosures.   (Compl. ¶ 61.)

The Complaint further alleges that Citizens calculates borrowers' Minimum Payments in a way that is contrary to the terms of the Agreements and results in mandatory Minimum Payments

---

[1] Plaintiffs did not attach the Maguires' Agreement to the Complaint, but did attach it to their Brief in Opposition to Citizens' Motion to Dismiss.   (Pls.' Br. Ex. Q.)   The Maguires' Agreement is identical in all relevant respects to the DiCiccos' Agreement.   We may consider the Maguires' Agreement in connection with Citizens' Motion to Dismiss because it is an "undisputedly authentic document[] [on which Plaintiffs'] claims are based."   <u>Mayer v. Belichick</u>, 605 F.3d 223, 230 (3d Cir. 2010).

that are higher than required during the first half of the Repayment Period.   (Id. ¶¶ 20-21.)
According to the Complaint, because the Agreement calls for an "amortized" payment schedule, it
should result in "a *level monthly payment* with *varying* amounts of the payment going to principal
and interest" as long as the applicable interest rate is unchanged (the "Equal Payment Method").
(Id. ¶ 19 (emphases in original).)   Instead, Citizens allegedly uses an "add-on-interest" method
(the "Add-on-interest Method"), which charges equal payments of principal plus "any interest
accrued during the billing cycle" for each month of the Repayment Period and results in higher
mandatory Minimum Payments during the first half of the Repayment Period.   (Id. ¶¶ 15, 21.)

By way of example, the DiCiccos and Citizens entered into an Agreement in 2003.   (Id. ¶
12 n.1.)   The Agreement was "reset" in June 2006 and permitted the DiCiccos to draw up to
$158,000.00 during a seven-year Draw Period.[2]   (Id.)   On February 6, 2013, Citizens sent the
DiCiccos an "End-of-Draw Notice," which advised them that, "in accordance with the terms of
[their] original line of credit agreement[,] [their] ability to write checks [against] the . . . account
[would] cease on June 9, 2013."   (Id. ¶ 15.)   The Notice further advised the DiCiccos that "[t]he
terms of [their] Agreement require[d] that [their] existing principal balance of $157,372 [would]
be payable over the next 180 months in equal principal payments of $874.29 plus any interest
accrued during the billing cycle."   (Id.)

Following this Notice and during the first year of the Repayment Period, Citizens charged
the DiCiccos between $1,359.00 and $1,375.00 as Minimum Payments in each monthly bill, using
the Add-on-interest Method.   (Id. ¶ 30; see also Compl. Ex. G.)   The Complaint alleges that the
DiCiccos should have been charged $1,144.34 per month based on Citizens' own online mortgage

---

[2] The Complaint offers no details as to why the DiCiccos' loan was altered in 2006.   Only
the June 2006 Agreement is attached to the Complaint and the allegations focus exclusively on the
language of that Agreement.

payment calculator, which uses the Equal Payment Method.[3]   (Compl. ¶ 28; see also Compl. Ex. F.)   According to the Complaint, use of the Add-on-interest Method has resulted in the DiCiccos being billed $3,122.76 more than what their Agreement allegedly required during the first year of repayment.   (Compl. ¶ 31.)   Notably, however, the DiCiccos did not make any payments to Citizens during the Repayment Period and, in late 2014, Citizens sent them a Notice of Default, asserting that they owed a total of $20,322.81 in unpaid monthly charges and late fees.   (See Compl. Ex. G.)

The Complaint alleges that the Maguires entered into an Agreement in April 2004, which permitted them to borrow up to $475,000.00 during a ten-year Draw Period.   (Compl. ¶ 13.) According to the Complaint, before the end of the Maguires' Draw Period, Citizens sent them an End-of-Draw Notice that was substantially identical to the Notice sent to the DiCiccos.   (Id. ¶ 16.) The Complaint further alleges that the Maguires should have been charged $3,049.23 as a minimum monthly payment (under the Equal Payment Method), but instead were charged $3,592.91 (under the Add-on-interest Method) for the month ending January 16, 2015.   (Id. ¶¶ 13, 33-35.)

The Complaint alleges that the DiCiccos' and the Maguires' Minimum Payment calculations exemplify an improper billing practice that Citizens has allegedly applied to all HELOC loans that originated since 2003, and which have recently transitioned into the Repayment Period.   (Id. ¶ 41.)

The DiCiccos commenced this action by filing a "Class Action Complaint" against Citizens on January 21, 2015.   On March 2, 2015, they filed an Amended Complaint, which

---

[3]   Under the Add-on-interest Method, the DiCiccos were charged $874.29 in principal, plus interest for the first month.   (Compl. ¶ 15.)   Under the Equal Payment Method, the DiCiccos would have been charged $652.60 in principal, plus interest for the first month.   (Compl. Ex. F at 2.)

added the Maguires as named Plaintiffs.   After seeking and obtaining leave of court, on April 17, 2015, Plaintiffs filed a Second Amended Complaint, which amended the class and subclass definitions.

The Second Amended Complaint contains four Counts.   Count I asserts a breach of contract claim, alleging that Citizens calculated the HELOC Minimum Payment in a way that the Agreements do not authorize, and seeks declaratory and injunctive relief.   Count II asserts a second breach of contract claim on the same basis, but instead seeks restitution as the remedy. Count III asserts a TILA claim based on Citizens' alleged (1) failure to disclose how Plaintiffs' Minimum Payments would be determined during the Repayment Period, and (2) unilateral change to the method by which it would calculate the Minimum Payment.   See 15 U.S.C. § 1637a(a)(8)(c) (mandating certain disclosures in connection with loan applications); 12 C.F.R. § 226.5b(f)(3) (prohibiting lender from unilaterally changing terms of loan).   Count IV asserts a UTPCPL claim based on Citizens' allegedly "unfair or deceptive practices" in connection with the HELOC loans.   See 73 Pa. Stat. Ann. § 201-2 (defining "unfair or deceptive practices" under the statute).   Citizens has moved to dismiss the entire Complaint for failure to state a claim upon which relief may be granted.   See Fed. R. Civ. P. 12(b)(6).

## II.   LEGAL STANDARD

When considering a motion to dismiss pursuant to Rule 12(b)(6), we "consider only the complaint, exhibits attached to the complaint, [and] matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." Mayer v. Belichick, 605 F.3d 223, 230 (3d Cir. 2010) (citing Pension Benefit Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir. 1993)).   We take the factual allegations of the complaint as true and draw all reasonable inferences in favor of the plaintiff.   DelRio-Mocci v.

Connolly Props., Inc., 672 F.3d 241, 245 (3d Cir. 2012) (citing Warren Gen. Hosp. v. Amgen, Inc., 643 F.3d 77, 84 (3d Cir. 2011)).   Legal conclusions, however, receive no deference, as the court is "'not bound to accept as true a legal conclusion couched as a factual allegation.'"   Wood v. Moss, 134 S. Ct. 2056, 2065 n.5 (2014) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)).

A plaintiff's pleading obligation is to set forth "a short and plain statement of the claim," Fed. R. Civ. P. 8(a)(2), which gives the defendant "'fair notice of what the . . . claim is and the grounds upon which it rests.'"   Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (alteration in original) (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)).   The complaint must contain "'sufficient factual matter to show that the claim is facially plausible,' thus enabling 'the court to draw the reasonable inference that the defendant is liable for [the] misconduct alleged.'"   Warren Gen. Hosp., 643 F.3d at 84 (quoting Fowler v. UPMC Shadyside, 578 F.3d 203, 210 (3d Cir. 2009)).   "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."   Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 556).   In the end, we will grant a motion to dismiss brought pursuant to Rule 12(b)(6) if the factual allegations in the complaint are not sufficient "'to raise a right to relief above the speculative level.'"   W. Run Student Hous. Assocs., LLC v. Huntington Nat'l Bank, 712 F.3d 165, 169 (3d Cir. 2013) (quoting Twombly, 550 U.S. at 555).

## III.   DISCUSSION

### A.   Breach of Contract Claims – Liability

Plaintiffs' breach of contract claims assert that Citizens breached its Agreements with Plaintiffs by calculating Plaintiffs' Minimum Payments using the Add-on-interest Method, when the Agreements only authorized calculation of Minimum Payments using the Equal Payment Method.   Citizens argues that the Complaint has not and cannot state a cognizable breach of

contract claim based on Citizens' use of the Add-on-interest Method to calculate Plaintiffs' Minimum Payments because the Agreement explicitly authorizes its use of that method.

To state a claim for breach of contract under Pennsylvania law, a complaint must specifically allege:   "'(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract and (3) resultant damages.'"   Kaymark v. Bank of Am., N.A., 783 F.3d 168, 182 (3d Cir. 2015) (quoting Omicron Sys., Inc. v. Weiner, 860 A.2d 554, 564 (Pa. Super. 2004) (internal quotation marks omitted)).   If a complaint fails to sufficiently plead one of these elements, the breach of contract claim should be dismissed.   Assembly Tech. Inc. v. Samsung Techwin Co., 695 F. Supp. 2d 168, 180 (E.D. Pa. 2010) (dismissing breach of contract claim because complaint did not sufficiently allege a breach of contractual duty).

In ascertaining the duties that a contract imposes, and whether they have been breached, the court must first interpret the terms of the contract.   "[T]he paramount goal of contract interpretation is to determine the intent of the parties."   American Eagle Outfitters v. Lyle & Scott Ltd., 584 F.3d 575, 587 (3d Cir. 2009) (citation omitted) (internal quotation marks omitted). "The strongest objective manifestation of intent is the language of the contract."   Baldwin v. Univ. of Pittsburgh Med. Ctr., 636 F.3d 69, 76 (3d Cir. 2011) (citations omitted).

### 1.    What Constitutes the "Language of the Contract"

Citizens maintains that the "language of the contract" in this case is not only the language of the Agreement itself, but also includes the TILA disclosures, which, in turn, include "Important Terms" that describe how Citizens will calculate Minimum Payments.   It has attached to its Motion the version of the disclosures that it claims to have provided to Plaintiffs, i.e., the "Home Equity Line of Credit application disclosure."   (Def.'s Mot. Ex. A).   Citizens argues that the Important Terms in those disclosures were incorporated by reference into the Agreement, pointing

to the Agreement's "Acknowledgement" provision, which states that the borrower "acknowledge[s] receipt of a copy of this Agreement, including the Fair Credit Billing Notice and the early Home Equity Line of Credit application disclosure, in addition to the handbook entitled 'When Your Home is On the Line: What You Should Know About Home Equity Lines of Credit,'. . . given with the application before signing the Mortgage.'"   (Compl. Ex. C § 40.)

In response, Plaintiffs contend that we should not consider the TILA disclosures to be part of the Agreement's language.  Plaintiffs contend that they did not receive these disclosures, at least with respect to Minimum Payment calculations, when they signed their Agreements, and they point to the Complaint's allegation that "[p]rior to extending credit, Citizens failed to disclose to Plaintiffs and the Class how their Minimum Payments were determined during the Repayment Period as required by [the] TILA, 15 U.S.C. Section 1637a(a)(8)(c) and its regulations."   (Compl. ¶ 61.)   They further assert that the disclosures that Citizens has submitted to the Court as Exhibit A could not have been disclosed to Plaintiffs at the time of their loan applications because the document's effective date is February 2005, and both the DiCiccos and the Maguires signed their original Agreements prior to 2005.[4]

"Incorporation by reference is proper where the underlying contract makes clear reference to a separate document, the identity of the separate document may be ascertained, and incorporation of the document will not result in surprise or hardship."   Standard Bent Glass Corp. v. Glassrobots Oy, 333 F.3d 440, 447 (3d Cir. 2003).   However, "in order to uphold the validity of terms incorporated by reference, it must be clear that the parties to the agreement had knowledge

---

[4] The Maguires' Agreement was signed on April 6, 2004, which pre-dates the February 2005 disclosures provided by Citizens.  In contrast, although the DiCiccos first signed an Agreement in 2003, they signed their "reset" Agreement on June 5, 2006, after the effective date of the disclosures.  Thus, any disclosures that the DiCiccos received in connection with the 2006 Agreement could have been the February 2005 version supplied by Citizens.

of and assented to the incorporated terms."   11 Williston on Contracts § 30:25 (4th ed. 2015).

Moreover, the Third Circuit has stated that when a party signs an agreement acknowledging

receipt of TILA disclosures, this written acknowledgement creates only a rebuttable presumption

of receipt.   Cappuccio v. Prime Capital Funding, LLC, 649 F.3d 180, 190 (3d Cir. 2011) (holding

that written acknowledgement of receipt of TILA disclosures creates only a rebuttable of actual

receipt).

In this case, Plaintiffs signed the Agreements acknowledging receipt of TILA disclosures,

but allege in their Complaint that they did not actually receive the disclosures that described how

their Minimum Payments would be calculated.   (See Compl. ¶ 61.)   Under these circumstances,

Plaintiffs have alleged facts to rebut the presumption of receipt and we cannot, on a motion to

dismiss, assume that they received the disclosures.   In other words, because Plaintiffs have

alleged that they did not receive notice of the payment calculations as required by the TILA, and

Citizens has only submitted a 2005 version of disclosures which post-dates at least the Maguires'

Agreement, we cannot now conclude that Plaintiffs had knowledge of and assented to the allegedly

incorporated terms.   Rather, we will not consider these disclosures in interpreting the Agreement

for purposes of resolving Citizens' Motion to Dismiss.[5]

## 2.      Interpreting the Agreement's Terms

Citizens argues that the Agreement unambiguously authorizes it to use the Add-on-interest

Method to calculate Plaintiffs' Minimum Payment and that we should therefore dismiss Plaintiffs'

---

[5] We also note that a plain reading of the Agreement casts doubt on whether the
Agreement even provides for the incorporation of any TILA disclosures, because the
"Acknowledgement" provision references only "receipt" of these disclosures and does not
explicitly provide for incorporation of such disclosures.  (Compl. Ex. C § 40.)  However, we
need not resolve this issue in order to resolve Citizens' Motion because, as explained above,
Plaintiffs have alleged that they did not receive the disclosures and, thus, we conclude that the
disclosures cannot be considered at this stage of the proceedings.

breach of contract claims for failure to state claims upon which relief may be granted.   In contrast, Plaintiffs argue that the Agreement unambiguously authorizes Citizens only to use the Equal Payment Method or, in the alternative, that the contract is ambiguous as to the method that must be used to calculate Minimum Payments.   They therefore contend that they have stated a cognizable breach of contract claim based on Citizens' use of the Add-on-interest Method.

"Courts have the responsibility to determine as a matter of law whether contract terms are clear or ambiguous."   Baldwin, 636 F.3d at 76 (citations omitted).   A contract is ambiguous if it is "reasonably susceptible of different constructions and capable of being understood in more than one sense."   American Eagle Outfitters, 584 F.3d at 587 (citations and internal quotation marks omitted).   In determining whether contractual language is ambiguous, "a court must consider the words of the contract, the alternative meaning suggested by counsel, and the nature of the objective evidence to be offered in support of that meaning."   Baldwin, 636 F.3d at 76 (citations and internal quotation marks omitted).

Here, the Agreement provides that the borrower's "regular payment" during the Repayment Period "will be based on an amortization of [the borrower's] balance over a 180 month period."   (Compl. Ex. C § 3.c.)   The borrower's payment will be due monthly and "in calculating the payment amount by amortizing the balance . . . , [Citizens] will use the applicable variable Annual Percentage Rate in effect on the day [it] calculate[s] [the borrower's] payment."   (Id.) The Agreement further provides that the borrower's "'Minimum Payment' will be the regular payment, plus any amount past due and all other charges.'"   (Id.)   It also provides for payment of a "FINANCE CHARGE on the outstanding amount of the principal balance . . . once each billing cycle during . . . the Repayment Period."   (Id. § 16.)

Citizens argues that the Agreement plainly provides that only the principal balance will be

amortized.   In its view, the Agreement's statement that the borrower's payment will be based on

an "amortization of the [borrower's] balance" plainly refers to the <u>principal</u> balance, not to the

balance plus interest.   (Compl. Ex. C § 3.c.)   It also emphasizes that the Agreement distinguishes

between a "regular payment" and a "Minimum Payment," and contends that the Agreement, by

explaining that the Minimum Payment is comprised of the regular payment plus all other charges,

makes clear that the Minimum Payment will be the amortized principal plus the variable finance

charge.   (<u>See id.</u>)   Indeed, it argues, because the finance charge will vary based on the average

daily balance, the number of days in the month, and the daily periodic interest rate (which is based

on a variable index), and the Agreement specifically provides that "[a]ny increase in the Periodic

Rate will take the form of higher payment amounts," we should reject Plaintiffs' assertion that the

Agreement required equal monthly payments.   (<u>Id.</u> § 19.)

      In contrast, Plaintiffs contend that the Agreement's language that the borrower's "regular

payment will be based on an amortization of [the borrower's] balance" can be, and should be, read

to mean that both the principal and interest will be amortized.   (<u>Id.</u> § 3.c.)   In their view, the

reference to "balance" in that provision does not mean only the "principal balance" or the

Agreement would have use the two-word phrase "principal balance."   They further argue that the

fact that the Agreement provides for a variable rate of interest does not dictate that the Minimum

Payments would not be level as is true under the Equal Payment Method, because Plaintiffs' claim

is only that the Minimum Payments would be level as long as the interest level remained the same.

Plaintiffs point out that the Complaint alleges that the term "amortization" in the context of home

mortgage loans typically means a payment schedule with "*level monthly payments* with <u>*varying*</u>

amounts of the payment going to principal and interest" (i.e., payments consistent with the Equal

Payment Method).   (Compl. ¶ 19.)   They further note that the Agreement provides that "[a]

change in [APR] can cause the balance to be repaid more quickly or more slowly," and argue that this provision is inconsistent with the Add-on-interest Method, which calls for equal payments of principal regardless of changes to APR.   (Compl. Ex. C § 3. c.)

Upon consideration of these arguments and the language of the Agreement, we reject Citizens' contention that the Agreement unambiguously authorizes it to utilize the Add-on-interest Method.   Notably, the Supreme Court has stated that "the word 'amortize' normally assumes interest charges" and has endorsed a definition of "amortization" that provides that "[i]f a loan is being repaid by the amortization method, each payment is partially repayment of principal and partially payment of interest."   Milwaukee Brewery Workers' Pension Plan v. Joseph Schlitz Brewing Co., 513 U.S. 414, 422, 426-27 (1995) (citation omitted) (quoting S. Kellison, The Theory of Interest 169 (2d ed. 1991)) (internal quotation marks omitted).   While this is not dispositive of the issue before us, the Supreme Court's understanding that the term "amortization" typically includes an interest component certainly casts doubt on whether the contract unambiguously supports Citizens' contention that the phrase "amortization of your balance" lacks an interest component.

Moreover, we are simply unable to reconcile Citizens' interpretation of the Agreement with the Agreement's statement that "[a] change in the [APR] can cause the balance to be repaid more quickly or more slowly.   When rates decrease, less interest is due so more of the payment repays the principal balance."   (Compl. Ex. C § 3.c.)   As Plaintiffs have argued, this language, on its face, seems inconsistent with the Add-on-interest Method, which provides for the repayment of the principal balance at a constant rate, independent of any interest rate changes.

In sum, we conclude that, when considering the Agreement without incorporating the TILA disclosures (as is required at this stage of the proceedings), the Agreement is "reasonably

susceptible of different constructions and capable of being understood in more than one sense" and, thus, is ambiguous as to how the Minimum Payments are to be calculated.   American Eagle Outfitters, 584 F.3d at 587 (citations and internal quotation marks omitted).   We therefore reject Citizens' argument that the breach of contract claims should be dismissed because the Agreements plainly and unambiguously provide for the calculation of Minimum Payments using the Add-on-interest Method, and we conclude that the Complaint plausibly alleges that Citizens breached a contractual duty.

### B.        Breach of Contract Claims – Damages and Injunctive Relief

Citizens also argues that we should dismiss Plaintiffs' breach of contract claims because (1) the Complaint does not allege facts that support the conclusion that Plaintiffs suffered any monetary damages as a result of the alleged breach; and (2) the Complaint does not support a claim for injunctive relief because it does not allege irreparable harm.[6]

### 1.        Damages

As noted above, to state a claim upon which relief may be granted for breach of contract, a complaint must allege damages resulting from the alleged breach.   Kaymark, 783 F.3d at 182 (citation omitted).   Here, the Complaint alleges that Plaintiffs were billed for "Minimum Payments that are far in excess of the amount required by their Loan Agreements" and, thus, "are entitled to restitution for amounts paid to Citizens during the Repayment Period in excess of the amount required by their Loan Agreements."   (Compl. ¶¶ 55, 57.)

---

[6] The heading for the portion of Citizens' brief that makes this second argument is: "Plaintiffs' Breach of Contract Claim for Injunctive *and Declaratory Relief* Must Be Dismissed." (Defs.' Br. at 16 (emphasis added).)   However, the argument that is developed under the heading does not address declaratory relief.   Accordingly, Citizens has provided us with no basis on which to dismiss the request for declaratory relief.

a.    No Actual Overpayment

Citizens first argues that the Complaint does not plausibly allege damages resulting from the alleged breach because the alleged facts do not support a conclusion that the calculations that Citizens used to determine Plaintiffs' monthly payments "will result in Plaintiffs paying a single penny more over the life of the Repayment Period when compared to the calculation that they contend is contemplated by the Agreement, nor can they."  (Defs.' Mem. at 14.)  Citizens emphasizes that Plaintiffs have only alleged that the Add-on-interest Method results in higher Minimum Payments during the first half of the Repayment Period, and points out that Plaintiffs "omit the inconvenient fact that the calculation used by Citizens necessarily results in correspondingly lower payment during the second half of the Repayment Period."  (Id.)  It therefore contends that the allegations do not support the conclusion that, over the life of the loan, Plaintiffs will pay more under the Add-on-interest Method than they would under the Equal Payment Method.

In response, Plaintiffs argue that the Complaint sufficiently alleges contractual damages that can be easily calculated.   They note, for example, that the Complaint clearly alleges that the Maguires have already overpaid $1,727.08 during the first three months of their Repayment Period and they therefore argue that the Maguires are entitled to restitution damages in that amount. (Compl. ¶ 36.)   Further, Plaintiffs argue that the decreased payments during the second half of the Repayment Period under the Add-on-interest Method do not negate the damages from the increased payments during the first half of the Repayment Period because an accelerated payment schedule denies Plaintiffs the benefit of the time-value of money derived from a slower repayment schedule, which Plaintiffs specifically bargained for in their Agreements.

While there is some appeal to Citizens' argument that the Complaint's allegations are not

14

precise as to the specific damages that Plaintiffs will suffer (or have suffered) as a result of the front-loaded payments, we conclude that, at this stage of the proceedings, the allegations are sufficient in this regard to support a breach of contract claim for damages.   Where, as here, the Complaint alleges that Plaintiffs are being asked to repay loans at an accelerated rate, we can draw the inference that Plaintiffs who paid their bills have suffered monetary damages as a result of that acceleration, if only due to the lost time-value of the money that they are being required to pay sooner rather than later.   We therefore reject Citizens' argument that the Complaint does not plausibly allege that the alleged breach of contract gives rise to monetary damages.

b.   <u>Failure to Pay Amounts Billed</u>

Citizens also argues, with respect to the DiCiccos only, that the Complaint fails to allege damages that can support a breach of contract claim because it does not allege that the DiCiccos actually paid any of the disputed Minimum Payments.   Citizens relies heavily on a Third Circuit decision in <u>Kaymark v. Bank of Am.</u>, 783 F.3d 168 (3d Cir. 2015).   In <u>Kaymark</u>, a mortgagor in default brought a breach of contract claim against his bank, based on the bank's filing of a foreclosure complaint that listed certain not-yet-incurred fees as due and owing.   <u>Id.</u> at 171-72. According to the mortgagor, inclusion of those fees breached the mortgage contract because the fees were not, in fact, due and owing under the terms of the mortgage contract.   <u>See id.</u> at 171. The Third Circuit, however, dismissed the breach of contract claim for failure to allege resultant damages, reasoning, in part, that because the mortgagor had not paid the disputed fees or expenses, it could not cite them as "damages" to support its breach of contract claim.   <u>Id.</u> at 183.

Plaintiffs argue that <u>Kaymark</u> is distinguishable from the instant case because it involved unpaid administrative fees, not unpaid mortgage payments.   <u>See id.</u> at 172-73.   However, that factual distinction is plainly inconsequential.   We therefore apply the logic of <u>Kaymark</u> and

15

conclude that, because the DiCiccos have not paid their Minimum Payments, they may not cite those minimum payments as damages to support their breach of contract claim.

Plaintiffs argue, in the alternative, that the Complaint adequately alleges damages suffered by the DiCiccos because it alleges that Plaintiffs will "suffer default, foreclosure, the loss of low-interest loans[,] impairment of their credit," and the loss of their homes if Citizens is not required to use the Equal Payment Method to calculate Plaintiffs' Minimum Payments.   (Compl. ¶¶ 52, 53(d).)   They further note that they have attached to their responsive brief Exhibits O and P, which are public records of Citizens' foreclosure action against the DiCiccos.   While they concede that Citizens has withdrawn the foreclosure action without prejudice, they emphasize that they remain in default and also remain "under the constant and immediate threat of a new foreclosure."   (Pls.' Br. at 28.)

Upon consideration of the parties' arguments, we conclude that the Complaint fails to plausibly allege that the DiCiccos have suffered any such damages as a result of Citizens' alleged breach.   While a portion of the DiCiccos' Notice of Default is attached to the Complaint (see Compl. Ex. G), the Complaint itself never alleges that the DiCiccos defaulted on their loan, were foreclosed upon, had their credit impaired, or lost an alternative low-interest loan.   Thus, the Complaint simply does not allege that the DiCiccos suffered the damages on which they now seek to rely.

We are, on the other hand, well aware from documents other than the Complaint, including the public records of Citizens' foreclosure action, that Citizens has, in fact, issued a notice of default to the DiCiccos and has instituted and subsequently withdrawn foreclosure proceedings. From this knowledge, we can comfortably infer that the DiCiccos' credit has been damaged. However, even if we were to consider these facts as if they had been alleged in the Complaint, we

cannot conclude that they support a claim for breach of contract damages when Plaintiffs <u>have</u> <u>nowhere specifically alleged that Citizens' alleged breach actually caused the default on the loan</u>. As noted above, breach of contract damages must be damages that actually resulted from the defendant's breach.  <u>Kaymark</u>, 783 F.3d at 182 (requiring plaintiff asserting breach of contract claim to allege "resultant damages" (citation omitted)); <u>see also</u> <u>Bd. of Trs., Roofers Local No. 30</u> <u>Combined Welfare Fund v. Int'l Fidelity Ins. Co.</u>, 63 F. Supp. 3d 459, 471 (E.D. Pa. 2014) (To recover breach of contract damages, a plaintiff "must show a causal connection between the breach and the loss." (citations omitted)).  Because the Complaint never alleges (1) that the DiCiccos could have and would have paid their Minimum Payments had they been calculated using an Equal Payment Method, and (2) that they only defaulted because they could not afford the higher payments required under the Add-on-interest Method, we conclude that the Complaint does not allege that the DiCiccos' default, threatened foreclosure, and credit damage actually resulted from Citizens' breach.  We therefore reject Plaintiffs' alternative theory regarding the DiCiccos' damages and dismiss the breach of contract (restitution) claim insofar as it concerns the DiCiccos.

### 2.    Injunctive Relief

Citizens argues that we should dismiss Plaintiffs' breach of contract claim for injunctive relief, which is asserted in Count I of the Complaint, because the Complaint does not allege facts that support a conclusion that Plaintiffs will or have suffered harm that cannot be compensated with monetary damages.[7]   Under Pennsylvania law, a plaintiff is entitled to a permanent injunction in order "'to prevent a legal wrong for which there is no adequate redress at law.'" <u>WellSpan Health v. Bayliss</u>, 869 A.2d 990, 995 (Pa. Super. Ct. 2005) (quoting <u>Buffalo Twp. v.</u>

---

[7] While the Complaint indicates that Plaintiffs seek both preliminary and permanent injunctive relief, Plaintiffs state in their responsive brief that they only seek a permanent injunction.  (<u>See</u> Pls.' Br. at 35-36.)   Accordingly, this is the only claim we consider.

Jones, 813 A.2d 659, 663 (Pa. 2002)).   As such, a court may issue a permanent injunction to

prevent an ongoing breach of contract that cannot be adequately compensated by monetary

damages.   See id. at 995-96.

Here, the Complaint alleges that, if we do not issue injunctive relief requiring Citizens

to use the Equal Payment Method to calculate Plaintiffs' Minimum Payments, Plaintiffs will suffer

"irreparable harm" that includes: "Citizens' improper and unauthorized acceleration of repayment

of the loan principal"; "[t]he loss of a HELOC loan at historically low interest rates"; "[a]n

unlawful and undisclosed penalty for having a loan balance at the end of the Draw Period"; and

"[d]efault, foreclosure and the loss of their homes."   (Compl. ¶ 53(a)-(d).)   Citizens contends that

these allegations in no way set forth harms that cannot be compensated with money damages and,

in addition, that the asserted harms are too remote and speculative to constitute irreparable harm.

Plaintiffs argue, however, that because of the unpredictability of the future interest rates that will

apply to their loans, their future monetary damages are too difficult to calculate, making injunctive

relief appropriate.   They further contend that damage to their credit due to overbilling constitutes

harm that cannot be compensated by monetary damages and that monetary damages are

insufficient to compensate the DiCiccos for the threat of foreclosure on their home.

Citizens' arguments on this issue are not particularly well developed; it cites only cases

involving preliminary injunctions in its opening brief and does not supplement its arguments in

any way in its Reply.   We also note that it is generally "inappropriate for the Court to limit the

remedies available to Plaintiffs" on a motion to dismiss and that it is preferable to assess the

availability of various remedies after liability is established.   Devon Robotics v. DeViedma, Civ.

A. No. 09-3552, 2010 WL 300347, at *6 (E.D. Pa. Jan. 25, 2010) (denying motion to dismiss claim

for permanent injunctive relief arising from an alleged breach of contract).   Moreover, reading the

Complaint liberally, we find that it plausibly supports the conclusion that a permanent injunction requiring Citizens to charge Minimum Payments calculated pursuant to the Equal Payment Method could be an appropriate remedy for Citizens' alleged miscalculation of Minimum Payments, particularly given that the Agreements require Plaintiffs to pay Minimum Payments for many more years.   We therefore deny Citizens' Motion to Dismiss insofar as it seeks dismissal of Plaintiffs' breach of contract claim seeking permanent injunctive relief.

## C.       TILA Claim

Count III asserts a TILA claim, contending that Citizens violated the TILA by (1) failing to disclose how Plaintiffs' Minimum Payments would be determined during the Repayment Period,[8] and (2) unilaterally changing the method by which it would calculate the Minimum Payment. Citizens argues in its Motion to Dismiss that the TILA claim is barred by the statute's one-year statute of limitations.

Congress enacted the TILA "to remedy the 'divergent and often fraudulent practices by which credit customers were apprised of the terms of the credit extended to them.'"   Smith v. Fidelity Consumer Disc. Co., 898 F.2d 896, 898 (3d Cir. 1990) (quoting Johnson v. McCrackin-Sturman Ford, Inc., 527 F.2d 257, 262 (3d Cir. 1975)).   The statute is therefore designed "to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit, and to protect the consumer against inaccurate and unfair credit billing and credit card

---

[8] This aspect of Plaintiffs' TILA claim is clearly based on an assertion that Plaintiffs received no pertinent TILA disclosures.   In their responsive brief, Plaintiffs suggest for the first time that they have an alternative claim that, if they received disclosures, those disclosures violated the TILA because they were confusing and misleading.   However, because Plaintiffs have not asserted this latter claim in their Complaint, and have not included in the Complaint any allegations regarding the content of any confusing or misleading disclosures, we will not address any such "alternative" TILA claim at this time.

practices." 15 U.S.C. § 1601(a). To that end, when a lender extends open-ended consumer credit that is secured by the borrower's principal dwelling, the TILA requires that the lender disclose the repayment options under the credit plan and provide the borrower with "an explanation of how the amount of any minimum monthly or periodic payment will be determined under each such option." 15 U.S.C. § 1637a(a)(8); see also 12 C.F.R. § 226.5b(d)(5)(ii) (stating that creditor must provide borrower with "[a]n explanation of how the minimum periodic payment will be determined and the timing of the payments"). Moreover, the statute requires that such disclosures be made at the time the lender distributes the credit application to the consumer. 15 U.S.C. § 1637a(b). The regulations implementing the TILA further prohibit a lender from unilaterally changing any of the terms of an open-ended consumer credit plan, with certain exceptions, none of which the parties assert are applicable here. 12 C.F.R. § 226.5b(f)(3).

Claims pursuant to the TILA are subject to the statute's one-year statute of limitations, which provides that an action must be brought "within one year from the date of the occurrence of the violation." 15 U.S.C. § 1640(e). The one-year statute on disclosure claims generally begins to run no later than the date on which the loan closes. See In re Cmty. Bank of N. Va., 622 F.3d 275, 303 (3d Cir. 2010) (citing 15 U.S.C. § 1640(e)). Where the claim is based on a change in the loan terms, however, the statute begins to run when the change in terms occurred. See Wulf v. Bank of Am., N.A., 798 F. Supp. 2d 586, 600 (E.D. Pa. 2011) (citing Hofstetter v. Chase Home Finance LLC, Civ. A. No. 10-1313, 2010 WL 3259773, at *12 (N.D. Cal. Aug. 16, 2010)).

At the same time, the limitations period is subject to equitable tolling. Ramadan v. Chase Manhattan Corp., 156 F.3d 499, 505 (3d Cir. 1998). Equitable tolling may be appropriate "where the defendant has actively misled the plaintiff respecting the plaintiff's cause of action." Williams v. EMC Mortg. Corp., Civ. A. No. 12-1215, 2013 WL 1874952, at *4 (E.D. Pa. May 3,

2013) (citation omitted).[9]   To show that a defendant actively misled him, a plaintiff must show that the defendant "engaged in affirmative acts of concealment designed to mislead the plaintiff[] regarding facts supporting [his] . . . claim."   Forbes v. Eagleson, 228 F.3d 471, 487 (3d Cir. 2000). "The party seeking equitable tolling must [also] demonstrate that he has been reasonably diligent in pursuing his claims."   Morilus v. Countrywide Home Loans, Inc., 651 F. Supp. 2d 292, 304 (E.D. Pa. 2008) (citation omitted).   Tolling based on active misleading lasts only "until the plaintiff knows, or should reasonably be expected to know, the concealed facts supporting the cause of action."   Oshiver v. Levin, Fishbein, Sedran & Berman, 38 F.3d 1380, 1392 (3d Cir. 1994).

Citizens divides its statute of limitations argument into two parts, the first concerning Plaintiffs' assertion that Citizens violated the TILA by failing to make application disclosures (the "non-disclosure claim") and the second concerning Plaintiffs' assertion that Citizens violated the TILA by changing the terms of the loan (the "change of terms claim").

### 1.     The Non-Disclosure Claim

With respect to the non-disclosure claim, Citizens asserts that a violation of the TILA's requirement that certain disclosures be made at the time of the borrower's application is, by definition, a violation that occurs at the time that the borrower applies for credit.   Here, the Complaint alleges (and the Agreements establish) that the DiCiccos and the Maguires each applied for their HELOC loan no later than 2006.   Accordingly, several years elapsed between the time that Plaintiffs submitted those applications (and the alleged disclosure violations occurred) and the time that they commenced this action in 2015.   According to Citizens, then, the one-year

---

[9]  Equitable tolling may also be appropriate "where the plaintiff in some extraordinary way has been prevented from asserting his or her rights" or "where the plaintiff has timely asserted his or her rights mistakenly in the wrong forum."   Williams, 2013 WL 1874952, at *4.   However, neither of these alternative bases for equitable tolling appears to be at issue in this case.

limitations period on Plaintiffs' TILA claims arising from Citizens' alleged failure to provide the disclosures has long-since expired.   Significantly, Plaintiffs do not dispute the timelines on which Citizens relies, but they argue that the limitations period should be equitably tolled because Plaintiffs had no knowledge that Citizens' initial disclosures were inadequate until their loans "reset" after ten years.

Upon consideration of these arguments, we conclude that Plaintiffs' non-disclosure claim is time-barred.   Where, as here, the plaintiff claims that the defendant violated the TILA's requirement that a disclosure be made at the time of the plaintiff's application, the violation occurs at the time of the application or, at the latest, when the loan closes.   See Barnes v. Compass Bank, 568 F. App'x 743, 745 (11th Cir. 2014) ("'If no disclosure was made, of course, the debtor would be cognizant of that fact on the day the credit disclosure forms were given to him . . . .'" (quoting Goldman v. First Nat'l Bank of Chicago, 532 F.2d 10, 17 (7th Cir. 1976))); In re Cmty. Bank of N. Va., 622 F.3d at 303 (stating that the TILA's one-year limitations period begins to run when the loan closes (citing 15 U.S.C. § 1640(e)).   Thus, Citizens' alleged non-disclosure violation occurred no later than the dates on which Plaintiffs entered into the operative Agreements, i.e., April 2004 for the Maguires and June 2006 for the DiCiccos, and far more than a year before this action was commenced in January of 2015.   While Plaintiffs argue that the limitations period should have been equitably tolled with respect to this claim, they do not allege or argue that Citizens somehow misled them as to whether it had provided them with the necessary TILA disclosure; rather, they argue only that Citizens concealed its method of calculating their monthly payment by failing to provide the pertinent disclosure.   Accordingly, Plaintiffs have advanced no argument that Citizens misled them as to the facts on which their non-disclosure claim is based and thus misled them as to whether they had a cause of action based on non-disclosure.   We therefore

conclude that Plaintiffs have failed to advance a plausible theory of equitable tolling and conclude that their claim based on Citizens' non-disclosure is time-barred.

### 2.    Change of Terms Claim

Citizens also argues that the change of terms claim is barred by the one-year statute of limitations.  In this regard, Citizens reiterates that Plaintiffs' allegation is that Citizens changed Plaintiffs' loan terms when it issued End-of-Draw Notices that utilized the Add-on-interest Method to calculate Plaintiffs' Minimum Payments (in spite of the Agreement obligating them to use an Equal Payment Method).  Citizens notes that the DiCiccos' End-of-Draw Notice, which Plaintiffs attach to the Complaint, is dated February 6, 2013, and the Complaint alleges that Citizens first billed the DiCiccos for a Minimum Payment that was calculated pursuant to the Add-on-interest Method when the DiCiccos entered their Repayment Period on July 9, 2013. (Compl. ¶ 30; Compl. Ex. D.)  Citizens thus argues that whether the alleged change in terms violation is considered to have occurred when the End-of-Draw Notice was issued or when Citizens first began billing the DiCiccos using the Add-on-interest Method, more than one year elapsed before the DiCiccos asserted their TILA claim in this action on January 21, 2015. Citizens therefore contends that Plaintiffs' change of terms claim, like the non-disclosure claim, is barred by the one-year statute of limitations.  In response, Plaintiffs argue that the Maguires' change of terms claim is timely and that there are factual issues regarding the timeliness of the DiCiccos' claim that cannot be resolved at this time.

As an initial matter, we recommend that the Maguires' claim is, in fact, timely.  While Citizens lays out a timeline regarding the DiCiccos' End-of-Draw Notice and billing, they do not lay out a comparable timeline for the Maguires and, thus, have not developed any identifiable argument regarding the timeliness of the Maguires' change of terms claim.  We further note that

the Maguires' End-of Draw Notice is dated March 4, 2014, less than a year before the commencement of this action in January 2015, and also less than a year before the Maguires were added as named Plaintiffs in the action when the First Amended Complaint was filed on March 2, 2015.   Accordingly, to the extent that Citizens intended to argue that the change of terms claim is time-barred insofar as it concerns the Maguires, we reject that argument.

With respect to the DiCiccos, Plaintiffs acknowledge that Citizens revealed in the End-of-Draw Notices that it would use an Add-on-interest Method for calculating Plaintiffs' monthly bills.   (See Pls.' Sur-Reply Br. at 7.)   They also concede that it was "evident" when they received their second bill during the Repayment Period that their payments would not be level.[10] (Id.)   They argue, however, that they have alleged facts to support an argument for equitable tolling of the DiCiccos' change of terms claim because they have alleged facts that support the conclusion that Citizens actively misled the DiCiccos regarding their cause of action.   See Williams, 2013 WL 1874952, at *4 (stating that the statute of limitations may be equitably tolled if the defendant actively misled the plaintiff regarding the plaintiff's cause of action).   Specifically, they point out that the End-of-Draw Notices indicate that the payment method that Citizens would be utilizing was "required" by Plaintiffs' Agreement, and they contend that the Notices thereby concealed the fact that Citizens was actually changing the terms of the loans.   They also contend that it "took time to unravel" whether the Agreement that Citizens referenced in the End-of Draw Notice was the Loan Agreement or the Mortgage.   (Pls.' Sur-Reply Br. at 8.)   They maintain that, because of this active deception, "it was not until after Citizens brought its foreclosure action that

---

[10]   Notably, unlike the Maguires, the DiCiccos received several bills for different amounts more than a year before they commenced this action.   (See Compl. Ex. G (reflecting that the DiCiccos received bills for $1,375.51 on both August 9, 2013, and September 9, 2013; a bill for $1,359.35 on October 9, 2013; a bill for $1,375.47 on November 9, 2013; and bill for $1359.30 on December 9, 2013).)

the DiCiccos recognized that Citizens had changed its billing practice."   (Id.)

While Plaintiffs' sparse allegations of active misleading are far from compelling, we conclude that they are at least plausible.  If, indeed, Citizens was changing the terms of the parties' agreement and yet suggested in the End-of-Draw Notice that the terms that it was applying were "required by the Agreement," then it was arguably engaging in conduct that served to mislead Plaintiffs as to the facts giving rise to their change of terms claim.   The Complaint does not detail what Citizens did after issuance of the End-of Draw Notice to further mislead Plaintiffs, if anything, and we are thus uncertain when the DiCiccos knew or should have known the concealed facts supporting their cause of action.   We note, however, that they have asserted that they did not know of the term change until Citizens instituted the foreclosure action.   In any event, we are mindful that the Third Circuit has stated that "because the question whether a particular party is eligible for equitable tolling generally requires consideration of evidence beyond the pleadings, such tolling is   generally not amenable to resolution on a Rule 12(b)(6) motion."   In re Cmty. Bank of N. Va., 622 F.3d at 301-02) (citations omitted).   We therefore decline to dismiss the DiCiccos' change of terms claim on statute of limitations grounds at this time and instead permit Plaintiffs the opportunity to develop facts in support of their equitable tolling theory with respect to this claim in discovery.

In sum, we conclude that Plaintiffs' non-disclosure TILA claim, as alleged, is barred by the one-year statute of limitations, but that their change of terms claim is not.   We therefore grant Citizens' Motion to Dismiss insofar as it concerns Plaintiffs' TILA non-disclosure claim, but deny the Motion as to the change of terms claim.

### D.      UTPCPL Claim

Count IV asserts a UTPCPL claim for unfair and deceptive practices, contending that the

Agreements and End-of-Draw Notices were deceptive and misleading regarding how Citizens would calculate the Minimum Payments, in violation of 73 Pa. Stat. Ann. §§ 201-2(4)(v), (vii), and (xxi).[11]

As a general matter, the UTCPCL prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce."  73 Pa. Stat. Ann. § 201-3.  To state a plausible claim under the UTPCPL, a complaint must allege that: "(1) [plaintiffs] purchased or leased goods or services primarily for a personal, family, or household purpose; (2) [plaintiffs] suffered an ascertainable loss of money or property; and (3) the loss occurred as a result of the use or employment by a person of a method, act, or practice declared unlawful by the UTPCPL."  Baynes v. George E. Mason Funeral Home, Inc., Civ. A. No. 09-153, 2011 WL 2181469, at *4 (W.D. Pa. June 2, 2011) (citing 73 Pa. Stat. Ann. § 201-9.2(a)).  The Complaint must also allege that the plaintiffs justifiably relied on the deceptive conduct.  See Hunt v. U.S. Tobacco Co., 538 F.3d 217, 221-22 (3d Cir. 2008) (stating that plaintiffs pursuing a claim under the UTPCPL must prove justifiable reliance).  In other words, the Complaint must allege that knowledge of the deceptive conduct "would have changed [Plaintiffs'] conduct."  Id. at 227.

Citizens argues that the Complaint fails to state a UTPCPL claim upon which relief may be granted because, inter alia, (1) the claim is nothing more than a re-casting of the breach of contract claim and, thus, is barred by the economic loss doctrine, and (2) the Complaint does not allege

---

[11] These provisions define "unfair or deceptive acts or practices" to include "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have," 73 Pa. Stat. Ann. § 201-2(4)(v); "[r]epresenting that goods or services are of a particular standard, quality or grade, or that goods are of a particular style or model, if they are of another," id. § 201-2(4)(vii); and "[e]ngaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding," id. § 201-2(4)(xxi).

justifiable reliance, which is a necessary element of a UTPCPL claim.[12]

### 1.    Economic Loss Doctrine

The economic loss doctrine "'prohibits plaintiffs from recovering in tort economic losses to which their entitlement flows only from a contract.'"   Werwinski v. Ford Motor Co., 286 F.3d 661, 671 (3d Cir. 2002) (quoting Duquesne Light Co. v. Westinghouse Elec. Corp., 66 F.3d 604, 618 (3d Cir. 1995)).[13]   Consequently, the doctrine limits plaintiffs to their contract claims "'when loss of the benefit of a bargain is the plaintiff[s'] sole loss.'"   Bohler–Uddeholm Am., Inc. v. Ellwood Grp., Inc., 247 F.3d 79, 104 (3d Cir. 2001) (quoting Duquesne Light, 66 F.3d at 618). To avoid application of the economic loss doctrine, plaintiffs must articulate "harm that is distinct from the disappointed expectations evolving solely from an agreement."   Sunburst Paper, LLC v. Keating Fibre Int'l, Inc., Civ. A. No. 06-3959, 2006 WL 3097771, at *3 n.3 (E.D. Pa. Oct. 30, 2006) (citation omitted).

---

[12] Citizens also argues that we should dismiss the UTPCPL claim insofar as it relies on Section 201-2(v) and (vii), because those sections relate solely to false advertising and Plaintiffs do not point to an advertisement on which they detrimentally relied.   Citizens is correct that "Pennsylvania state and federal courts have ruled that [subsection (v) applies] only to claims of false advertising."   Seldon v. Home Loan Servs., Inc., 647 F. Supp. 2d 451, 466 (E.D. Pa. 2009) (citing Karlsson v. FDIC, 942 F. Supp. 1022, 1023 (E.D. Pa. 1996), aff'd, 107 F.3d 862 (3d Cir. 1997), and Weinberg v. Sun Co., 740 A.2d 1152, 1167 (Pa. Super. Ct. 1999), rev'd on other grounds, 777 A.2d 442 (Pa. 2001)).   Significantly, Plaintiffs do not explicitly respond to this argument but, at the same time, they no longer make any reference to subsection (v). Accordingly, we understand Plaintiffs to have abandoned any reliance on subsection (v).

In contrast, Citizens has cited no definitive authority in support of its argument that a claim under subsection (vii) relates solely to false advertising, and Plaintiffs make clear that they are not abandoning their claim under that subsection.   Accordingly, we reject Citizens' argument that we dismiss Plaintiffs' UTPCPL claim insofar as the claim relies on subsection (vii) because that subsection only concerns false advertising.

[13] Plaintiffs initially argued that Werwinski was not controlling and contended that we should apply the Pennsylvania Superior Court's decision in Knight v. Springfield Hyundai, 81 A.3d 940 (Pa Super. Ct. 2013), which concluded that the economic loss doctrine does not bar UTPCPL claims, because UTPCPL claims are statutory claims, not tort claims.   Id. at 952. However, in their Sur-Reply Brief, Plaintiffs concede that Werwinski is binding authority in this Court.   (See Pls.' Sur-Reply Br. at 10.)

Here, as best as we can discern, Plaintiffs allege that Citizens made three misrepresentations in violation of the UTPCPL:

1. It misrepresented in the Agreements that it would use an Equal Payment Method to calculate Minimum Payments when it instead intended to (and did) use the Add-on-interest Method.

2. It failed to disclose in the Agreements that it intended to calculate Plaintiffs' Minimum Payments using the Add-on-interest Method.

3. It issued End-of-Draw Notices that calculated the Minimum Payments using the Add-on-interest Method, thereby misrepresenting that the Add-on-interest Method was appropriate when, in fact, it was contractually obligated to use the Equal Payment Method.

(See Compl. ¶¶ 67-69; see also id. ¶¶ 14, 17.)   The Complaint alleges that as a result of Citizens' deceptive conduct, Plaintiffs "have and will be caused substantial monetary damage . . . by being required to pay excessive Minimum Payments during their Repayment Period," i.e., Minimum Payments calculated pursuant to the Add-on-interest Method.  (Id. ¶ 72.)   In the "wherefore" clause of the UTPCPL Count, they ask for "restitution for the portion of Minimum Payments made during the Repayment Period of their Home Equity Line of Credit in excess of the amount that would be due by use of an amortized billing method," i.e., in excess of the amount due by use of the Equal Payment Method.   (Id. 27 ¶ (c).)

Upon consideration of these allegations and averments, we conclude that Plaintiffs' UTPCPL claim seeks to "'recover[] in tort economic losses to which their entitlement flows only from a contract.'"   Werwinski, 286 F.3d at 671 (quoting Duquesne Light Co., 66 F.3d at 618). Indeed, it seems plain that the essence of Plaintiffs' UTPCPL claim is that Citizens engaged in

deceptive and misleading conduct insofar as they contracted to do one thing and yet did another. Consistent with this theory, the economic relief that Plaintiffs seek in connection with the UTPCPL claim is the loss of the benefit of their alleged contractual bargain, i.e., they seek to be liable only for Minimum Payments calculated using the Equal Payment Method.   Moreover, the "wherefore" clause of Plaintiffs' breach of contract claim seeks the same measure of economic damages as the "wherefore" clause of the UTPCPL claim.   (See Compl. 23 ¶ (b) (averring that that, for Citizens' breach of contract, Plaintiffs are entitled to "restitution for the amount of Minimum Payments made during the Repayment Period of their Home Equity Line of Credit that are in excess of the amount due by use of an amortized . . . billing method").)

Plaintiffs argue that their UTPCPL claim is substantially similar to the plaintiffs' UTPCPL claim in Abraham v. Ocwen Loan Servicing, LLC, Civ. A. No. 14-4977, 2014 WL 5795600 (E.D. Pa. Nov. 7, 2014) (Padova, J.), and that we should therefore hold, as we did in Abraham, that the claim is not barred by the economic loss doctrine.   Abraham, however, is easily distinguishable from the instant case.   The plaintiffs in Abraham were individuals who entered into loan modification agreements with the defendant loan servicer after they had difficulty in paying their mortgages.   2014 WL 5795600, at *2-3.   The modification agreements contained balloon disclosures, which advised the plaintiffs that they would owe a single balloon payment of unpaid principal at the conclusion of the loan, but did not disclose the amount of the balloon payment or how it would be calculated.   Id.   When the balloon payments came due, they were much more substantial than the plaintiffs anticipated.   Id.   The plaintiffs therefore asserted a UTPCPL claim against defendants, alleging that the loan servicer engaged in deceptive conduct by failing to estimate the amount of the balloon payments, explain how the payments would be calculated, and/or provide an amortization schedule disclosing the amount of interest and principal that would

be paid over the life of the loan.   Id. at *4.

In concluding that the economic loss doctrine did not bar the UTPCPL claim in Abraham, we explained that the claim did "not flow from the contractual obligation contained in the language of the modification – i.e., a failure by [the loan servicer] to make the loan on the terms provided in the agreement – but rather [flowed] from the information [the loan servicer] failed to provide the [p]laintiffs before they entered in the agreements." Id. at *7. We further observed that the plaintiffs' alleged damages arising from the asserted UTPCPL violation were not contract damages but were, instead, damages arising out of the loan servicer's failure to disclose the balloon payment that would result from its adherence to the contract.   Id.   Thus, in contrast to the instant case, Abraham did not involve a situation in which the plaintiffs (1) alleged in their UTPCPL claim that they suffered damages as a result of a contractual breach, and (2) sought breach of contract damages in connection with that claim.   We therefore reject Plaintiffs' argument that Abraham supports the conclusion that the economic loss doctrine does not bar their claims and, for the reasons set forth above, we conclude that Plaintiffs' UTPCPL claim in this case is barred by the economic loss doctrine.

### 2.     Justifiable Reliance

Although we could dismiss Plaintiffs UTPCPL claim on the basis of the economic loss doctrine alone, Citizens also validly argues that Plaintiffs have failed to state a UTPCPL claim upon which relief may be granted because they have failed to allege justifiable reliance.   As noted above, plaintiffs seeking relief on a UTPCPL claim must allege that they justifiably relied on the defendant's allegedly deceptive conduct.   See Hunt, 538 F.3d at 224.   In other words, they must allege that, had they known of the defendant's deception, they would have altered their own conduct.   Id. at 227.   "In the context of a mortgage transaction, '[t]o show justifiable reliance a

plaintiff must provide evidence demonstrating how his knowledge of a mortgage loan's actual terms would have altered his decision to execute the mortgage.'" <u>Slapikas v. First Am. Title Ins. Co.</u>, 298 F.R.D. 285, 294 (W.D. Pa. 2014) (quoting <u>Laidley . Johnson</u>, Civ. A. No. 09-395, 2011 WL 2784807, at *3 (E.D. Pa. July 11, 2011)).

Here, the Complaint alleges that Plaintiffs "relied on Citizens' misrepresentations and deceptive and confusing conduct; they were all required to read and 'acknowledge' these misrepresentations in the Loan Agreements; and they were all required to pay more than was due to avoid default." (Compl. ¶ 71.) Plaintiffs characterize this Paragraph as alleging that they relied on the Agreements' representations when deciding to enter into the loan with Defendants, and they maintain that this allegation suffices to plead justifiable reliance. However, even accepting Plaintiffs' questionable characterization of these allegations, the Complaint nowhere alleges (and Plaintiffs do not assert in their briefs) that Plaintiffs would not have entered into the Agreements had they understood that Citizens had misrepresented that it would be using the Equal Payment Method to calculate their Minimum Payments and that, in fact, Citizens would use the Add-on-interest Method to calculate those payments. Likewise, they do not assert that they would not have entered into the Agreements if they had been provided, at the time they entered into the Agreements, a schedule setting forth the Minimum Payments that Citizens would actually be collecting during the Repayment Period. In fact, they simply do not allege or otherwise assert that they would have done <u>anything</u> differently had they been aware of Citizens' alleged misrepresentations.

Accordingly, we conclude that Plaintiffs have not sufficiently alleged that they justifiably relied on Citizens' alleged misrepresentations and, thus, conclude that the Complaint fails to state a UTPCPL claim upon which relief can be granted on this basis as well as because the claim

violates the economic loss doctrine.   We therefore dismiss Plaintiffs' UTPCPL claim both because it violates the economic loss doctrine and because the Complaint fails plausibly to allege justifiable reliance.

### E.        Leave to Amend

Plaintiffs have requested that, if we dismiss any of their claims, we also grant them leave to amend their Complaint to cure any deficiencies that we have identified.   It is well-established that "if a complaint is subject to Rule 12(b)(6) dismissal, a district court must permit a curative amendment unless such an amendment would be inequitable or futile." Phillips v. Cnty. of Allegheny, 515 F.3d 224, 245 (3d Cir. 2008) (citing Alston v. Parker, 363 F.3d 229, 235 (3d Cir. 2004)).   To determine futility, we apply the same analysis that would govern a motion to dismiss under Fed. R. Civ. P. 12(b)(6).   See In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1434 (3d Cir. 1997).   "'Futility' means that the complaint, as amended, would fail to state a claim upon which relief could be granted." Id.

In this case, in spite of extensive briefing and oral argument, Plaintiffs have articulated no facts or theories that would cure the various pleading deficiencies that we have identified.   We therefore conclude that Plaintiffs' amendment of the claims we are dismissing would be futile. Accordingly, we deny Plaintiffs' request that we give them leave to amend.

## IV.   CONCLUSION

For the foregoing reasons, we grant Citizens' Motion to Dismiss insofar as it seeks dismissal of Plaintiffs' (1) UTPCPL claim, (2) TILA claim that is grounded on Citizens' alleged non-disclosures, and (3) breach of contract claim seeking restitution on the DiCiccos' behalf. We deny the Motion in all other respects, thereby permitting Plaintiffs to proceed on (1) the

Maguires' breach of contract claim seeking restitution, (2) the breach of contract claim for injunctive relief, and (3) the TILA claim that is grounded on Citizens' alleged change of terms.

An appropriate Order follows.

BY THE COURT:

/s/ John R. Padova, J.
_____

John R. Padova, J.